# UNITED STATES COURT OF APPEALS
# DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 7 2025

RECEIVED

Armour Lyle Jolley,
Appellant

v.

Unknown Named BOP Directors et al.,
Appellees.

Case No. 24-5111

# APPELANT'S REPLY BRIEF

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned pro se Appellant certifies as follows:

Parties and Amici. The plaintiff-appellant is Armour Lyle Jolley. The defendants-appellees are "Unknown Named BOP Directors," "Unknown Named BOP Employees," Antonelli, Ballesteros, an "Administrative Remedy Coordinator," Nylen, Blanco. There is no amicus curiae.

Rulings Under Review. Jolley appeals from the March 22, 2024, memorandum opinion and order by Judge Colleen Kollar-Kotelly granting the defendants' motion to dismiss. The opinion is available in the Brief For Appellees (BFA) in the appendix (A. 143) and on Westlaw: Jolley v. Unknown Named BOP Directors, Civ. A. No. 22-2580 (CKK), 2024 WL 1240091 (D.D.C. Mar. 22, 2024). And from the orders by Judge Colleen Kollar-Kotelly on March 7, 2023 denying a request for hearing and appointment of counsel, again denying a request for hearing on August 14, 2023, and again denying a request for a hearing on March 22, 2024.

Related Cases. This case has not previously been before this Court. Undersigned certifies that there are no pending related cases.

i

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases     i

Table of Contents     ii

Introduction     1.

Reply Argument     3.

I. The District Court Incorrectly Dismissed Jolley's Civil Action
Against Officials Of The BOP For Protected Constitutional Rights Violations.     3.

A. Falsifying Records and First Amendment Retaliation Claims.     3.

B. The District Court Incorrectly Found Jolley Failed to Properly State
a Claim.     4.

C. The District Court Inappropriately Found It Lacked Personal Jurisdiction.     6.

D. The District Court Wrongly Concluded that Qualified Immunity Applies.     8.

E. Jolley Alleges Facts Showing a Direct Involvement by Bureau
Directors.     10

II. The District Court Incorrectly Dismissed Jolley's Due Process Claims     11.

  A. The District Court Improperly Concluded that Jolley Lacks a Liberty
      Interest in Gang Validation.     12,

  B. The District Court Incorrectly Concluded that Jolley's Due Process Rights
      Were Unviolated Regarding His Wrongful ADX Placement.     15,

III. The District Court Inappropriately Dismissed Jolley's Claims of Cruel
    And Unusual Punishment.     18.

IV. The District Court Improperly Denied Jolley's Request for Appointment
    of Counsel.     19.

Conclusion     22.

Certificate of Service     23.

Attachments: A, B, C, D

# INTRODUCTION

Plaintiff Armour Lyle Jolley is a federal prisoner housed at the Administrative Maximum prison in Florence Colorado (ADX) since December 7, 2021. His ADX placement came as a result of the wrongful gang validation stemming from retaliation, and falsifications of prison records by BOP officials. Jolley now spends his every day in a 75 square foot cell where he will remain in solitary confinement indefinitely because of agency officials' wrongdoings.

It is clearly left to the BOP to determine prisoners classifications and placements. However, the question that the district court never recognized or answered is if a prisoner shall be afforded the processes that the BOP declares to afford all inmates written in the BOP policies? Or if it is a due process violation when the policies and processes are arbitrarily disregarded by officials.

Furthermore, if officials are protected by immunities after they knowingly break the law, as could be proven to a jury here at trial. Following such wrongdoings, officials rarely correct mistakes as it would require acknowledging their wrongs. Therefore, a prisoner's only hope to correct wrongs suffered at the hands of officials is through the courts, as the courts are the only remaining check available.

Jolley believes that the district court erred in finding that his complaint is deficient in alleging facts to show that the individual defendant's actions caused him injuries. Especially following multiple denied requests for a single, to reveal relevant facts contained within Jolley's prison records.    hearing

Even though it is often said that sunlight is the best disinfectant, the government opposed any hearings. And the district court in its duty to seek the truth in this case, never afforded an evidenciary/disovery hearing before dismissing this case.

1.

For jurisdictional issues, as injuries took place at numerous BOP locations including at the BOP Central Office, and at least one of the defendants resides and works in the District of Columbia, this case is believed by Jolley to be in the proper jurisdiction. If not, then the district court should have transferred the case to the district where Jolley is now located. The government itself in its Motion to Dismiss (pg. 17), concerning proper venue pointed the district court to Section 1406(a) and recommended the court to transfer this case to the District of Colorado. However, Jolley just now realizes that jurisdiction and venue are altogether different things.

Jolley also believes that the district court failed to clearly understand his Eighth Amendment claims. Placement alone to the ADX Florence is not a cruel and unusual punishment departing from the expectations of confinement if truly justified. But if not, and if full process is not afforded, then it is cruel and unusual. And if being wrongfully validated as a gang member as a result of retaliations, then facing all consequences coming from the validation such as indefinite solitary confinement, this is cruel and unusual punishment. Liberty interest exist under these circumstances.

Therefore, the order dismissing this case by the district court without prejudice should be overturned.


See Appellant's Brief for Jurisdictional Statement, Statement of Issues, Statement Of The Case, Statement OF The Facts, and Appellant's Arguments.

# COUNTER ARGUMENTS

**I.** The District Court Incorrectly Dismissed Jolley's Civil Action Against Officials Of The BOP For Protected Constitutional Rights Violations.

## A. Falsifying Records and First Amendment Retaliation Claims.

After first discoverying that his rights had been violated, and following the denial of relief by the BOP to correct falsifications to his prison records and for due process violations, Jolley was left to look to the courts as this was the only option remaining to him.

Being denied by the district court appointment of counsel, Jolley who is untrained in the law proceeded forward on his own as a pro se prisoner in preparing his case. To his understanding there are only two available avenues for a prisoner to sue in the federal courts. A suit under Section 1983 allowing a path for state inmates to litigate in federal court, and then a Bivens claim. And Jolley is covered under 1983 too. Jolley proceeded onwards with hopes that the district court might have a little understanding and give some leeway to a pro se prisoner with no legal knowledge in his pleadings. He explained with the facts he had knowledge of, the falsifications to his prison record, due process violations, and alleged the type of activity that he had engaged in that is protected under the First Amendment. Also explaining to the very best of his ability the infringments on his rights to engage in those activities. And describing the retaliatory actions, including why they did not advance legitimate penological goals. Jolley also alleged the three necessary elements required in order to properly assert a First Amendment claim for

retaliation, Including the intentional falsification to his prison record by Blanco as part of the retaliations. In no feasible way could these types of activities advance a penological objective when the falsification was indeed used as part of Jolley's wrongful gang validation two years later.

After refusing to afford Jolley a single requested hearing needed to obtain critical information contained within his prison record held by only the defendants, the district court incorrectly decided that Jolley had failed to allege facts supporting his claims. The prison records hold all of the relevant evidence to support the facts of this case.

Although claims under Bivens, it's damages or nothing. And Jolley does not seek any specific monetary damages against the defendants. Jolley's complaint explains the harm caused by the falsification of his prison record as part of his retaliation claim, so the First Amendment retaliation claim does not stand alone. Furthermore, as Jolley does specifically request injunctive and declaratory relief, the district court in its wisdom and knowledge of the legal parameters should have recognized this case as a Constitutional claim by any name being brought by a pro se prisoner in the interrest of justice, Section 1983 lawsuits cover federal prisoners too in D.C. courts.

## B. The District Court Incorrectly Found Jolley Failed to Properly State a Claim.

Jolley does dispute the district court's conclusion that he failed to properly state his claims. Because the district court concludes that Jolley's pleadings fail to contain sufficient plausible factual matter, fundamental fairness requires that Jolley be afforded opportunity

4.

to conduct discovery so that he can, if possible, meet his burden of establishing jurisdiction. See Miller v. United States, 530 F. Supp. 611 (E.D. Pa. 1982). A preliminary hearing is necessary to determine any disputed facts upon which motion or opposition to it is predicated. See Commodities Export Co. v. U.S. Customs Service, 888 F.2d 431 (6th Cir. 1989), remanded 733 F. Supp. 109, 14 Ct. Int'l. Trade 166 (Ct. Int'l Trade 1990).

As Jolley's does, a ~~pro se~~ complaint will survive a motion to dismiss under Fed. R. Civ. P. 8(a)(2) if it contains a short and plain statement of the claims showing that the pleader is entitled to relief. The district court presumes that Jolley has a protected First Amendment right (Mem. Op. at 26). The immediate action by Blanco following that right, to investigate Jolley and enter false evidence into his prison record in retaliation, for no other reason but to be used in a future wrongful gang validation that did indeed cause Jolley injury. Although the wrongful validation occurred a couple of years later, absent the false evidence entered by Blanco, Jolley would not have met the needed criteria for a gang validation. The unknown named official, who without affording Jolley any necessary due process, used the false evidence by Blanco to wrongfully validate Jolley a gang member two years later. The wrongful validation was administered at the BOP ~~███~~ Central Office located in Washington D.C. The initial immediate actions of Blanco were in the "very close" time frame proximity demanded by the Supreme Court. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

Because of this "very close" suspect timing of the retaliatory actions by Blanco to Jolley's protected activity, the district court incorrectly concluded that it was only Jolley's personal belief in stating his claims. (Mem. Op. at 26). Again, the necessary relevant evidence contained within Jolley's prison record would establish necessary causation and validate Jolley's claims if ever afforded. Also again,

any gang investigation or gang validation based on false evidence and connected to retaliation does not advance a legitimate penological objective as other courts have found. Both issue of suspect timing and valid penological purpose connected to retaliation are involved in two cases cited in Jolley's Brief at 14, to support these arguments. The cases are Bruce v. Ylst and Rizzo v. Dawson, cases that the government in their brief at 25 say are unavailable. Therefore in hopes to assist with locating these cases, see Attachment 4 of this Reply Brief for information from the Lexis Nexis Group. As noted above, Jolley has alleged sufficient facts to establish Defendants engaged in retaliatory actions. To Jolley's understanding he is not suing the United States, but these Defendants who are people, as well as government officials. In either case, it may not matter... United States or officials.

Where Jolley's action is brought by a pro se plaintiff, a district court has an obligation "to consider his filings as a whole before dismissing a complaint," Schnitzler v. United States, 761 F.3d 33, 38, 411 U.S. App. D.C. 412 (D.C. Cir. 2014) (citing Richardson, 193 F.3d at 548), because such complaints are held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). Albeit far from perfectly, Jolley did meet the standards needed to properly state his claims.

## C. The District Court Inappropriately Found It Lacked Personal Jurisdiction.

Because Jolley asserted the sufficient known available facts, without afforded access to his prison record, to plead his claim against these individual Defendants, the district court inappropriatly found it lacked personal jurisdiction in this matter. As Jolley bears the burden of establishing personal jurisdiction over

each Defendant, so again fundamental fairness requires that Jolley be afforded opportunity to conduct discovery in order to obtain his prison record, so that he can if possible meet his burden of establishing jurisdiction, Miller v. United States. With regard to these critical relevant prison records, "unlike with a motion to dismiss under Rule 12(b)(6), the Court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction," Doe v. United States 797 F. Supp. 2d 78, 81 (D.D.C. 2011). Because Jolley does not merely claim that the district court has personal jurisdiction over Defendants Blanco, Nylen, Antonelli and Ballesteros because of their status as a government employee who works for an agency headquartered in Washington D.C., but because of their harm causing actions against him that are connected to this forum, the district court with its discretion to this complex matter should have considered the materials being sought by Jolley. (His prison record). And as these facts are disputed, again a preliminary hearing is necessary to determine any disputed facts upon which motion or opposition to it is predicated. Commodities Export Co. v. U.S. Customer Service. Following its release, Jolley's prison records will reveal the relevant information connecting this forum. This information will be directives in the form of letters, emails and memorandums between these Defendants and officials at the BOP Central Office located in Washington D.C. that are related to Jolley's wrongful gang member investigation,

---

[1.] Included with Defendants Blanco, Nylen, Antonelli and Ballesteros, the district court also incorrectly found it lacks personal jurisdiction over the "unknown named BOP Administrative Remedy Coordinator," (Am. Compl. at 11) for the equally applied flawed arguments put forth that all are merely government employers who work for an agency headquartered in Washington D.C.

(Mem. Op. at 14)

validation and ADX placement. Therefore, the District of Columbia's long arm statute does apply to these Defendants. "In determining whether a basis for personal jurisdiction exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff." Crane v. Zoological Soc'y, 894 F.2d at 456 (D.C. Cir. 1990). The district therefore inappropriately concludes that it lacks personal jurisdiction over Defendants Blanco, Nylen, Antonelli and Ballesteros.

## D. The District Court Wrongly Concluded that Qualified Immunity Applies.

The government in their brief at 28 falsly claims that none of the Defendants in this case have been served. In truth, Ballesteros was served on December 20, 2022 and the district court presumes that all individual defendants have been served with process. Mem. Op. at 2.

At any rate, the district court incorrectly held that all of the Defendants are entitled to qualified immunity. Mem. Op. at 16-22. Even though for instance, Blanco in retaliation began investigating Jolley for gang validation, and intentionally entered false evidence into Jolley's prison record with the knowledge it would be used for future gang validation. Or for instance, Ballesteros in her ADX referral evaluation intentionally referrenced falsly that Jolley "has committed murders, ordered murders and been involved with multiple assaults," knowing that her evaluation was for the purpose of Jolley's ADX placement. These claims by Ballesteros are not only unfounded, but completely untrue and very harmful to Jolley. These are only two examples where any reasonable official in Blanco's or Ballesteros' shoes would understand that what they are doing is unlawful. Many more examples are described as part of the complaint.

"Government officials enjoy qualified immunity... unless their conduct violates 'clearly established statuatory or constitutional rights of which a reasonable person would have known.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Other courts have correctly held that "prison officials cannot use a proper and neutral procedure in retaliation for a prisoner's exercise of his constitutional rights. While First Amendment rights are curtailed in prison, they are not lost." And that defendants are not entitled to qualified immunity in a retaliation claim. See *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003). This in itself is denial of a liberty interest and are only a few examples of why the district court incorrectly found all to be entitled qualified immunity in this case.

It is true that Jolley raised a due process claim regarding the false record enteries, wrongful gang validation and ADX placement. But the district court incorrectly concluded that Jolley admits defeat on his assertions of a right to avoid gang validation and designation to ADX by acknowledging general classifications and general BOP designations do not require a hearing. However, Jolley shows in his pleadings that a gang validation and ADX placement are held by BOP policy to a much higher standard and require a specific process. This is because the BOP itself recognizes liberty interests related to gang validation and ADX placement. The due process claims are discussed further below.

Additionally, Jolley in his Amended Complaint at 24-30 does identify specific allegations asserting that Blanco was partly responsible for his wrongful gang validation. And the same with Nylen at 33-41. The district court was wrong to conclude that Nylen only delivered the bad news to Jolley about his gang validation.

Furthermore, the government incorrectly states that Jolley argues that Ballesteras and Antonelli had responsibility for his classification. Gov't Brief at 31. But what

9

Jolley actually argues is that Ballesteros had some responsibility for his wrongful ADX placement. Am. Compl. at 47-53. The same for Antonelli at 54-67. He does identify specific allegations in regards to all Defendants. The only way to further support his claims, Jolley needs to be afforded a necessary hearing and be granted discovery. His prison records need to be exposed to sunlight and the Court also.

Therefore, the district court improperly concluded that none of these Defendants were directly responsible for Jolley's false record entries, wrongful gang validation and wrongful ADX placement. The Defendants in this case are not entitled to qualified immunity. If so, they are then given open field to run over an inmates rights. They knowingly broke the law here.

### E. Jolley Alleges Facts Showing a Direct Involvement by Bureau Directors.

Jolley's Appeal Brief at 30 does point to the identified factual allegations contained as part of his Complaint at 21-104, in supporting his claims that the BOP Director defendants were directly involved in his wrongful gang validation, ADX placement, and the false record entries after the fact. These allegations describe how officials themselves acted unconstitutionally, and the allegations do not rest merely based on the Director's supervisory roles.

The foundation to support that the BOP Directors were personally involved in part with Jolley's wrongful gang validation and ADX placement would be fully established based on the information/evidence located within Jolley's prison record.

These Directors have liability because for instance, after being made aware by Jolley in 2021 of his wrongful gang validation and ADX placement, Director Michael

Carvajal whos tenure was plagued by criminal activity, with his willful ignorance failed to act. In fact, on August 1, 2022 during a hearing at the U.S. Senate Permanent Investigation Subcommittee, Director Carvajal received a "bi-partisan dressing-down" for his failures as Director. At this hearing Carvajal attempted to deflect blame for his failures to his subordinates. The senators responded, "It's almost willful ignorance," "Don't want to hear what's happening below me," "It's a disgrace," "And for the answer to be 'other people deal with that, I got the report, I don't remember.' It's completely unacceptable." See Attachment B. These senators could plainly see the culpability clue to Director Carvajal's failure in his running of the BOP. However, the district court failed to do the same.

So Jolley's case is far from the only time that Director Carvajal has dropped the ball, and Director Collette Peters has done no more to correct this matter. So these BOP Directors do have involvement with Jolley's wrongful gang validation, ADX placement and even failed to correct the falsifications made to his prison record by Blanco and Ballesteros. The exact depth of these Directors true involvement can only be brought to light by the release of discovery materials in this case.

## II. The District Court Incorrectly Dismissed Jolley's Due Process Claims.

The district court incorrectly dismissed Jolley's due process claims on the grounds that he failed to refute established caselaw, that he has no liberty interest in his classification by BOP officials, and that he failed to allege facts sufficient to show that Defendants failed to provide an adequate process regarding his ADX placement.

## A. The District Court Improperly Concluded that Jolley Lacks a Liberty Interest in Gang Validation.

Jolley does treat his wrongful gang validation separate from his wrongful ADX placement, because the gang validation is connected to retaliation by officials and First Amendment violations. Also, although they both are involving due process violations, the wrongful gang validation and the wrongful ADX placement were administered by ███████ separate Defendants, and a different timeframe.

As a footnote in the Defendant's Brief at 32, they argue that Jolley is attempting to raise a new claim in his appeal by simply pointing to the Administrative Procedure Act in his Brief at 27. This is no new claim, but only puts a name to his claims that are the crux of the due process violations, that are clearly asserted throughout his pleadings as a whole. And this is, if an agency provides, or declares to provide a process when administering its policies, then that process shall be afforded and administered by officials.

Defendants argue that Jolley has "no clearly established right-whether by statute or under the Constitution-to be shielded from classification as an Ayran Brother, even assuming the classification was based upon false or incorrect information." Def's. Mem. at 19. The district court incorrectly agreed because courts have recognized that the classification and designation of inmates is a matter within the BOP's discretion.

The BOP itself with its discretion recognize that prisoners such as Jolley, although may not have a right to any specific classification, they do have a liberty interest and established right in avoiding a wrongful Ayran

Brotherhood validation. This is because the BOP recognizes that there are grievous losses that come with such a validation. A liberty interest.

The agency of the BOP adopted its disruptive group validation process that covers the Aryan Brotherhood, from Pugliese v. Nelson 617 F.2d 916, 925-26 (2d Cir. 1980). See Attachment C. Accordingly the function of the "Due Process Clause... would be to protect prisoners against erroneous classifications that might cause them a grievous loss." This adopted process does not include general classifications that are administered by the BOP officials. Those require a completely separate process. But the adopted process shall be administered with all Aryan Brotherhood validations. The risk of erroneous validation is supposed to be minimalized by procedures "which include notices of tentative and final designations to each potential [Aryan Brotherhood member], a generalized statement of the reasons and bases for the designation, permission to submit oral or written objections supported by documentary evidence." Furthermore, on December 31, 2007 the BOP issued its Program Statement 5180.05 to again direct officials to administer this process. See Attachment D.

The caselaw relied on by the Defendants and the district court in this case do not address this adopted BOP policy. Preceding courts were most likely unaware that the BOP adopted such policy for Aryan Brotherhood validation. It is clear that Jolley is not absent a liberty interest, and is entitled this BOP due process. Jolley in his pleadings has clearly refuted the caselaw relied upon by Defendants and the district court to show that he does have a liberty interest with respect to a wrongful Aryan Brotherhood validation by prison officials.

The Defendants in their Reply Brief at 8 claim to the district court that Jolley received precisely this process and is owed no additional process. However, if

13

released, Jolley's prison record would clearly show this to be a false misdirection made to the court. Jolley received absolutely none of the process that he was due per BOP Program Statement 5180.05. If so, it would be well documented in Jolley's prison record per BOP policy.

As these are disputed facts that should be left to a jury, the district court should have used its discretion to grant Jolley the requested production of any relevant designated documents or electronically stored information - including writings, photographs, images or other data compilations.

Jolley made multiple unsuccessful requests to the district court to compel the Defendants to provide this crucial evidence at a time when it would demonstrate that the facts that he alleged in his Complaint are indeed true. All of Jolley's requests for discovery evidence were opposed by Defendants, and the only plausible reason would be their awareness that the evidence will prove Jolley's claims. He is not, and never has been a gang member. Furthermore, will never become one.

When BOP officials ignore their established procedures, and choose to disregard recognized due process, then they run outside the scope of their authority. And by doing so here, they have hi-jacked Jolley's very identity as he has never joined a prison gang. Therefore, this is by far the most critical issue to Jolley as it negatively impacts his entire future.

A review of Jolley's pleadings as a whole will show that contrary to the district court's findings for reason to dismiss, Jolley not only alleges that an unknown named official located in Washington D.C. was responsible for his wrongful gang validation, but also Defendants Blanco and Nylen as well. As Blanco initiated a gang validation investigation in retaliation for Jolley engaging in protected activity covered under the First Amendment. As part of his investigation, Blanco supplied false evidence

14

Knowing that it would influence the decision to wrongfully validate Jolley as an Aryan Brotherhood member. Furthermore, Defendant Nylen was not merely the deliverer of the bad news to Jolley regarding his wrongful validation as the district court incorrectly concluded. But Nylen possessed a specific role as is alleged in Jolley's pleadings. See Am. Compl. at 33-46.

Therefore, the unknown named official located in Washington D.C., Defendants Blanco and Nylen are all liable for violating Jolley's Fifth Amendment rights, as their actions give rise to the wrongful gang validation claim.

Jolley does assert well-pled allegations in his pleadings to show that the consequences of his wrongful gang validation amount to an atypical and significant hardship to him in relation to the ordinary incidents of prison life.

Because of the reasons given above, the district court incorrectly dismissed Jolley's due process claim regarding his wrongful gang validation connected to retaliation and First Amendment violations that occurred at the hands of Defendants.

## B. The District Court Incorrectly Concluded that Jolley's Due Process Rights Were Unviolated Regarding His Wrongful ADX Placement.

The district court incorrectly held that Jolley failed to state a plausible claim that his ADX placement interferes with a liberty interest, or that he was deprived of a sufficient level of procedural due process. This after Jolley alleging well-pled facts sufficient to show that Defendants failed to afford the complete due process per BOP policy regarding his wrongful ADX placement.

This Court recognizes, "a lesser liberty interest in avoiding particular conditions of confinement may arise if Sandin's requirements are met." Aref, 833 F.3d at 256 (quoting Wilkinson v. Austin, 545 U.S. 209, 221-22 (2005)).

Jolley meets the requirements of Sandin by showing a protected liberty interest regarding his wrongful ADX placement, see Jolley Br. at 26, see also Am. Compl. at 89 and Pl's Opp'n at 35. (Keeping in mind that the well-pled claims attest to the fact that currently ADX placement is indefinate for all Aryan Brotherhood members regardless of their sentence. Therefore, because of Jolley's wrongful ~~gang~~ Aryan Brotherhood status, there is no afforded periodic review of his ADX placement. So all factors of Wilkinson, 545 U.S. at 225-226 are not met). Furthermore, the lesser liberty interest does apply here as all ADX prisoners are housed in solitary confinement with exception of those in the step-down process, which Aryan Brotherhood members are ineligible for per the National Gang Unit (NGU).

The district court incorrectly concluded that Jolley admits defeat on his assertions of a right to avoid ADX placement by his acknowledgment that general transfers do not require a hearing. As Jolley has been transfered at least a dozen times while being a federal prisoner, he is well too aware and familiar the process. But per BOP policy, an ADX transfer is held to a unique standard that requires its own established process. Where a hearing is afforded and a "right" to appeal follows on adverse decision. See Am. Compl. Ex D.

Jolley was never afforded his "right" to appeal as it was thwarted by a BOP official. See Am. Compl. at 68-80, also Jolley Br. at 26-22. The district court only noted that Jolley received a notice and a hearing, but never

16

addressed the issue of his right to appeal, that was not afforded as part of his wrongful ADX placement. Jolley does plead a due process violation. And as his indefinite ADX placement that includes solitary confinement, this particular situation demands full procedural protections under Wilkinson, 545 U.S. at 224. The full BOP procedure, states to provide a "right" to appeal an ADX placement decision following a hearing. The district court was incorrect to conclude that even though BOP officials erred in the handling of Jolley's ADX appeal, such conduct did not deprive him of his due process.

Jolley's ADX placement stems from his wrongful Aryan Brotherhood validation, regardless of the blanket referral reasons used for all Aryan Brotherhood members throughout BOP prisons at the time. The blanket referral states that an investigation completed on April 7, 2021 identified Jolley as an Aryan Brotherhood member, even though he was wrongfully validated as such at least six months prior. Additionally, the blanket referral states that as a member, Jolley "possessed direct knowledge of a planned assault, and assisted in the facilitation of a potential agency wide race war."

The district court fails to recognize that it is a blanket referral. At trial Jolley would show this, and that these allegations are false as the evidence would show, clearly. Also with respect to this underlying subject matter of Jolley's ADX placement, at trial Jolley would easily show: (1) that he is not a gang member, and (2) his prison disciplinary record reflects clear conduct since 2015, and absolutely never any type of gang related activities. He has absolutely no involvement in activities described in the subject matter of his ADX placement. Therefore, the BOP would not possess any kind of fiscal and administrative burdens of

additional or substitute procedural requirements as the Defendants assert. Def. Br. at 39. Additionally, the Defendants' position is that though Jolley is a prisoner, therefore his liberty interest in avoiding indefinite solitary confinement is lessened in some way, and this makes absolutely no sense. The Defendants further proffess that Jolley admits that he was accorded fair process. Def. Br. at 38-39. As his pleadings as a whole clearly show, this is not so.

Jolley was never afforded his "right" to appeal the ADX placement that he sought. Accordingly, The BOP's ADX placement process was never completed, per BOP policy. Therefore, the district court incorrectly dismissed his due process claims.

## III. The District Court Inappropriately Dismissed Jolley's Claims of Cruel and Unusual Punishment.

The Eighth Amendment prohibits punishments that not only involve the unnecessary and wanton infliction of pain, but also punishments that "are grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 346 (1981).

The district court was incorrect in its conclusion that Jolley's entire Eighth Amendment claim pertains to the conditions of confinement at the ADX. But, as the ADX is a prison designed to house the most recalcitrant prisoners in solitary confinement, Am. Compl. at 92, and officials place a prisoner there who is truely undeserving of such treatment, then that prisoners punishment is grossly disproportunate to the severity of his crime.

The district court improperly concluded that Jolley's allegations fail to assert that his wrongful ADX placement was "a departure from what a prisoner could

expect after being convicted, sentenced and incarcerated." *Mem. Op. at 27*. However, Jolley does make these allegations in his pleadings. See *Am. Compl. at 89-104*, and *Pl's Opp'n. at 45*.

Furthermore, the Defendants argue here that Jolley's appeal focuses only on the combination of his solitary confinement at ADX that stemmed from retaliations in regards to his wrongful gang validation, rather than arguing his conditions of confinement violated the Eighth Amendment. *Def.'s Br. at 41*. But this is simply not so, as Jolley argues that "it's not only ADX conditions in and of themselves that give rise to his claims, it's a combination of factors in addition to ADX placement." *Jolley Br. at 33*. One of these combined factors that is asserted, is that per the *National Gang Unit*, as Jolley's status as an Aryan Brotherhood member he will remain housed in solitary confinement at the ADX indefinitely without the normal periodic review. *Jolley Br. at 34*.

Courts have found that an indeterminate period of confinement in isolation is a deprivation sufficiently grave to form the basis of an Eighth Amendment violation. *Hutto v. Finney, 437 U.S. 678 (1978)*, and *Wilson v. Seiter, 501 U.S. 294, 298-99 (1991)*.

Therefore, due to the hardships alleged in Jolley's pleadings that amount to Eighth Amendment violations, the district court wrongfully held that he failed to state a claim for which relief can be granted.

## IV. The District Court Improperly Denied Jolley's Request for Appointment of Counsel.

The district court abused its discretion when deciding not to appoint counsel to Jolley

For multiple reasons.

First, Jolley has shown that he simply can not afford legal representation. And after contacting at least a dozen attorneys, Jolley was unsuccessful in obtaining a lawyer as this case has a low value regarding awarded damages. Jolley supplied the district court copies of these letters along with his two separate requests for the appointment of counsel. ECF No. 3 and ECF No. 15.

Next, the issues involved in this case are very complex. Take for example several points argued by the Defendants and found by the district court: 1) Even if Jolley is not an Aryan Brotherhood member, and was improperly classified as such, he can not sue. Defendants' Motion to Dismiss at 19, ECF No. 17. This after the BOP's refusal to recognize and correct Jolley's wrongful gang validation that continues to cause him harm. 2) Even if the falsifications that cause eternal harms, were made to Jolley's prison record, he can not sue. Id. at 22. 3) Even if Jolley's Eighth Amendment claims are true, he can not sue. Id. at 23. 4) Even if Jolley's wrongful gang validation was initiated for retaliatory reasons, he can not sue. Defendants' Reply Br. at 8, ECF Nos. 31-32, 5) Even if Jolley has a Constitutional right that was infringed upon by BOP officials, he can not sue. Id. at 10. 6) Even if the district court could exercise personal jurisdiction in this case, Jolley can not sue. District Court's Memorandum Opinion, (Mem. Op.) at 16. 7) Even if he has a liberty interest regarding his wrongful gang validation, Jolley's allegations are not pled properly. Id. at 19. 8) Jolley's allegations are too vague. Id at 23. And, 9) Jolley's assertions are not properly supported. Id. at 25.

So, as this case is obviously very complex and far beyond the mental grasp of a prisoner with only a highschool education, the district court in the interest of justice should have appointed counsel to at least review this case for Jolley.

20

Furthermore, the district court has been made aware that Jolley is currently housed in solitary confinement with limited access to legal materials and very limited allowed time for legal research opportunity. These are not Jolley's only hardships that the district court is aware of. Jolley suffers with a myriad of health issues that interfere with his daily functions, and ability to litigate. These include Type 2 diabetes which require insulin, hypothyroidism, hyperlipidemia, essential hypertension, hypoparathyroidism, hyper-inflated lungs, allergic rhinitis, astigmatism, and presbyopia. See Am. Compl. at Ex. A.

Although Jolley may possess the ability to read and write, as pointed to above, the district court found his arguments not properly pled and too vague. Which shows that he is not completely able to articulate his claims, Therefore, the district court may under "exceptional circumstances" such as Jolley's appoint counsel for civil litigations pursuant to 28 U.S.C. § 1915(e)(1). See Gerber v. Agyeman, 545 U.S. 1128, 125 S. Ct. 2941, 162 L. Ed. 2d 867 (2005). Involving the proper discretion to consider the complexity of the legal issue involved such as Jolley's. As a pro se prisoner litigant with extremely limited legal understanding of the law, Jolley has done his best. But as this case has merit, and is quite complex as it involves multiple defendants with seperate individual issues, and the particular issues involve very difficult areas of the law, only a trained attorney could navigate through the legal world that is the justice system in this case.

As stated above, Jolley has made two seperate requests to the district court for appointment of counsel. Not only has the district court abused its discretion in this case for not appointing Jolley counsel in the interest of justice, but has also abused its discretion in other areas as well. Just a couple of examples to affirm this point are that the district court should have granted at least one of Jolley's multiple requests for an evidentiary/discovery hearing. But instead, the district court denied

Jolley's requests as simply moot. Mem. Op. at 28. Additionally, the district court recklessly made the blantant mischaracterization of Jolley by stating, "Jolley was found to have participated in the planning of an agency wide race war." Id. at 27. When in fact, the actual allegation made as part of Jolley's blanket ADX referral alleges that Jolley had knowledge of a planned assault, which the BOP speculated could cause an agency wide race war. Am. Compl. at Ex. C. Two completely different descriptions of the allegations and actual facts involved here.

These are a few examples of the district court's abuses of discretion in this very complex case. Therefore, this Court should find that counsel should have been appointed for Jolley.

## CONCLUSION

Notably, perhaps judicial overload is an appropriate concern in determining whether statuatory standing to sue should be conferred upon certain plaintiffs. But this inherently self-interrestal concern has no appropriate role in interpreting the contours of a substantive constitutional right. Since the burdens on the courts is presumably worth bearing when a prisoner's suit has merit, see Hudson v. McMillian, et al., 503 U.S. 1, 117 L.Ed. 2d 153, 112 S. Ct. 995 (1992).

Jolley is no litigator, he barely made his way through the 12th grade. This is not a hobby for him as this is his first prose legal endeavor. But through the very hardest of ways, he has learned the obvious differences between right and wrong. Therefore, he can easily recognize the wrongs of others just as his own. And what he is currently indefinitely living through is because of the intentional, willful wrongs by the Defendant BOP officials involved in this case. Defendants who are represented

22

by the very best of lawyers with unlimited resources.

Also critically notable for the Court's consideration is the fact that a Section 1983 lawsuit is available to federal prisoners, such as Jolley, in the D.C. federal courts. Not only a Bivens claim. Therefore, a lawsuit under Section 1983 would cover all of Jolley's civil action claims to be considered if it so pleases the Court.

For the foregoing reasons, the judgment of the district court should not be affirmed.

Dated: March 3, 2025

Respectfully submitted,

Armour Lyle Jolley

Armour Lyle Jolley
09304-091
ADX
P.O. Box 8500
Florence, CO 81226

## Certificate Of Service

This Brief in Reply was delivered to prison officials on the 3rd day of March, 2025 for Court filing.

Attachment A.

PATRICK R. RIZZO, Plaintiff-Appellant, v. J. DAWSON, Correctional Counselor; L. WILLIAMS,
Correctional Counselor; J. STOCKER, Vocational Instructor; and T. HOWELL, Correctional
Counselor, et al., Defendants-Appellees
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
778 F.2d 527; 1985 U.S. App. LEXIS 25415
No. 84-1602
December 12, 1985, Decided
May 13, 1985, Argued and Submitted

**Editorial Information: Prior History**

{1985 U.S. App. LEXIS 1} Appeal from the United States District Court for the Northern District of
California, William H. Orrick, District Judge, Presiding. (D.C. No. C-83-0815-WHO).

**Counsel**        Patrick R. Rizzo, Springfield, Missouri, for Defendants-Appellees.
                       John K. Van De Kamp, Atty. General, Thomas A. Brady, Dep.
          Atty. Gen., Kenneth C. Young, Dep. Atty. Gen., San Francisco, California, for
          Plaintiff-Appellant.
**Judges:** Merrill, Tang, and Fletcher, Circuit Judges.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff prisoner sought review after the United States District Court for the
Northern District of California dismissed plaintiff's in forma pauperis civil rights action by a summary
order before process issued. A prisoner alleging retaliation because of the exercise of his First
Amendment rights in bringing and assisting in civil rights litigation had to allege that the prison
authorities' retaliatory action did not advance legitimate correctional goals.

**OVERVIEW:** Plaintiff prisoner filed an in forma pauperis civil rights action in which plaintiff alleged that
his transfer out of a prison was in retaliation for his work as a "jailhouse lawyer" assisting other inmates
with habeas petitions and other federal actions. The trial court dismissed this and other civil rights claims
alleged by plaintiff. The court affirmed the dismissal of plaintiff's U.S. Const. amend. IV, equal
protection, and due process claims, but vacated and remanded plaintiff's claim for retaliation. The court
held that plaintiff had no liberty interest in remaining at a particular prison and that plaintiff had no
constitutional right to rehabilitation. The court held that plaintiff had stated a claim for retaliation as to his
transfer the prison. The court held that plaintiff had sufficiently alleged that the retaliatory acts
complained of were not a reasonable exercise of prison authority and that they did not serve any
legitimate correctional goal.

**OUTCOME:** The court vacated and remanded the order that dismissed plaintiff prisoner's in forma
pauperis civil rights action by a summary order before process issued. The court held that plaintiff stated
a claim for retaliation.

**LexisNexis Headnotes**

C09CASES                                           1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

*Procunier v. Martinez*, 416 U.S. 396, 412, 40 L. Ed. 2d 224, 94 S. Ct. 1800 (1974); *Storseth v. Spellman*, 654 F.2d 1349 (9th Cir. 1981). However, the limitation must be no greater than is necessary to protect the particular governmental interest involved. *Procunier v. Martinez, supra*, 416 U.S. at 413.

For Rizzo to state a cause of action, therefore, he must do more than allege retaliation because of the exercise of his first amendment rights in bringing and assisting in civil rights litigation; he must also allege that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals. *See Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984). In this case the plaintiff has alleged that Stocker's actions were retaliatory and were arbitrary **{1985 U.S. App. LEXIS 14}** and capricious. He has thereby sufficiently alleged that the retaliatory acts were not a reasonable exercise of prison authority and that they did not serve any legitimate correctional goal. 4 Accordingly, we hold that plaintiff has stated a cause of action notwithstanding the limitation on his associational rights because of his status as a prisoner. Summary dismissal was improper as to this claim. We therefore remand to the district court for further proceedings on the retaliation claim.

**{1985 U.S. App. LEXIS 15}** REVERSED and REMANDED.

### Footnotes

1

Plaintiff's eighth amendment claim is not pressed on appeal.

2

*Franklin II* suggests there is no substantive difference between the frivolous standard and the pro se standard for dismissal for failure to state a claim. Therefore, even had process issued in this case and the district court dismissed for failure to state a claim, our review would be the same -- whether the plaintiff's claim lacked arguable substance in law or fact.

3

While it appears that plaintiff alleged no explicit liberty or property interest, procedural requirements in and of themselves, could create a protected interest if the procedures are intended to be a significant substantive restriction on decision-making. *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984). However, defendant Stocker's 30-day evaluation is not a substantive restriction on the prison authorities' discretion to transfer or reassign the plaintiff and, therefore, cannot be the basis for a due process claim.

4

This is not to say, however, that bare allegations of arbitrary retaliation are enough by themselves, to avoid dismissal. Dismissal may have been warranted if there was no factual support for the allegations or the factual support was contradicted by facts that the court could notice or that were apparent in the record. Rizzo's complaint does not fall into this category. Rizzo alleges that Stocker recommended his reassignment on the basis of too many library passes. The fact that Rizzo was absent too often and that this led to his poor evaluation is apparent from Stocker's evaluation in the record. Yet, even were Rizzo's complaint deemed factually deficient, the court should have, but did not, allow Rizzo the opportunity to amend. At present, it is not clear that there was, in fact, retaliatory motive, that the prison officials acted arbitrarily or that the complaint could survive summary judgment. However, in light of our finding that the alleged retaliation states a cause of action, the complaint, though inartfully drafted, should survive summary dismissal.

C09CASES                                          8

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

VINCENT **C. BRUCE,** Plaintiff-Appellant, v. **EDDIE YLST; G.** E. HARRIS; P. H. CARRILLO; P. E. TINGEY; **A. GODFREY;** D. MARRIOTT, Correctional Counselor; M. COZIAHR, Lieutenant; L. WASHINGTON, JR., Correctional Officer; ROBERT AYERS, JR., Warden; J. MCGRATH; T. SCHWARTZ, Associate Warden; D. SMITH, Captain; B. J. O'NEILL, Captain; RAUL J. DILLARD, Captain; GARY H. WISE, Lieutenant; M. PILAND; G. M. ATER; K. BURNS; M. JOHNSTON; S. C. WOHLWEND; TERHUNE; PADILLA, Defendants-Appellees.

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

351 F.3d 1283; 2003 U.S. App. LEXIS 24772; 63 Fed. R. Evid. Serv. (Callaghan) 221

No. 01-17527

November 5, 2003, Argued and Submitted, San Francisco, California

December 10, 2003, Filed

**Editorial Information: Subsequent History**

Related proceeding at Bruce v. Cate, 2010 U.S. Dist. LEXIS 43088 (N.D. Cal., Apr. 5, 2010)Motion denied by, Without prejudice, Request granted Bruce v. Ylst, 2014 U.S. Dist. LEXIS 44992 (N.D. Cal., Mar. 31, 2014)Motion denied by, in part, Stay granted by Bruce v. Ylst, 2016 U.S. Dist. LEXIS 137212 (N.D. Cal., Sept. 30, 2016)Motion granted by, Stay granted by Bruce v. Ylst, 2016 U.S. Dist. LEXIS 176165 (N.D. Cal., Dec. 20, 2016)Motion denied by, Motion denied by, Without prejudice, Request granted, Dismissed by, in part Bruce v. Ylst, 2018 U.S. Dist. LEXIS 180099 (N.D. Cal., Oct. 19, 2018)

**Editorial Information: Prior History**

{2003 U.S. App. LEXIS 1} Appeal from the United States District Court for the Northern District of California. D.C. No. CV-99-04492-VRW. Vaughn R. Walker, District Judge, Presiding.

**Disposition:**

Affirmed in part, reversed and remanded in part.

**Counsel**          Kelly A. Woodruff, Farella Braun & Martel LLP, San Francisco, California, for the plaintiff-appellant.

Anya M. Binsacca, Attorney General's Office, San Francisco, California, for the defendants-appellees.

**Judges:** Before: David R. Thompson, Stephen S. Trott, Circuit Judges, and Charles R. Weiner, * Senior District Judge. Opinion by Judge Trott.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff inmate appealed from the United States District Court for the Northern District of California's entry of summary judgment in favor of defendant prison officials in his 42 U.S.C.S. § 1983 action, which claimed that when prison officials validated him as a prison gang affiliate, they did so in retaliation for his jailhouse lawyering activities and with insufficient evidence, in violation of his First and Fourteenth Amendment rights.District court improperly dismissed an inmate's retaliation claim on summary judgment because the evidence raised a triable issue of fact regarding whether the motive behind the validation of the inmate as a gang affiliate was retaliatory.

**OVERVIEW:** There was some evidence in the record to support the conclusion that the inmate had ties

A09CASES                                    1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

ensure absolute equality.

***Civil Rights Law > Prisoner Rights > Access to Courts***

A chilling effect on a prisoner's First Amendment right to file prison grievances is sufficient to raise a retaliation claim.

***Civil Rights Law > Section 1983 Actions > Scope***
***Civil Rights Law > Prisoner Rights > General Overview***

A prisoner suing prison officials under 42 U.S.C.S. § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline.

***Civil Rights Law > Section 1983 Actions > Scope***
***Criminal Law & Procedure > Postconviction Proceedings > Imprisonment***

In a 42 U.S.C.S. § 1983 action, timing can properly be considered as circumstantial evidence of retaliatory intent.

***Civil Rights Law > Prisoner Rights > General Overview***

A prisoner plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains.

***Constitutional Law > Substantive Due Process > Scope of Protection***
***Civil Rights Law > Prisoner Rights > Discipline***

The "some evidence" standard of Hill did not apply to retaliation claims. The "some evidence" standard applies only to due process claims attacking the result of a disciplinary board's proceeding, not the correctional officer's retaliatory accusation.

***Civil Rights Law > Prisoner Rights > Discipline***

Prisons have a legitimate penological interest in stopping prison gang activity. But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish an inmate because he filed grievances, they cannot assert that the inmate's validation served a valid penological purpose, even though he may have arguably ended up where he belonged.

***Civil Rights Law > Prisoner Rights > Discipline***
***Civil Procedure > Summary Judgment > Opposition > General Overview***
***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***
***Civil Procedure > Summary Judgment > Standards > Materiality***

Prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right.

***Civil Procedure > Remedies > General Overview***
***Civil Rights Law > Prisoner Rights > General Overview***
***Criminal Law & Procedure > Postconviction Proceedings > Imprisonment***

A09CASES                                            3

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

In fashioning a remedy, federal courts must remember that the duty to protect inmates' constitutional rights does not confer the power to manage prisons or the capacity to second-guess prison administrators, for which we are ill-equipped. The relief ordered by federal courts must be consistent with the policy of minimum intrusion into the affairs of state prison administration.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Prisoner Rights > Discipline*

The prohibition against retaliatory punishment is clearly established law in the United States Court of Appeals for the Ninth Circuit, for qualified immunity purposes.

**Opinion**

**Opinion by:**          Stephen S. **Trott**

**Opinion**

{351 F.3d 1286} TROTT, Circuit Judge:

I

Vincent C. Bruce appeals the district court's entry of summary judgment in favor of defendant prison officials in his 42 U.S.C. § 1983 action. He argues that his submission to the court raised genuine issues of material fact with respect to his claims that when prison officials validated him as a prison gang affiliate, they did so in retaliation for his jailhouse lawyering activities and with insufficient evidence. This, he argues, violated his Fourteenth Amendment rights to due process{2003 U.S. App. LEXIS 2} and equal protection, and his First Amendment right to file prison grievances.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331; this court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court granted defendants' motion for summary judgment on all three claims. We affirm the district court as to the due process and equal protection claims. As to the First Amendment retaliation claim, we reverse and remand for further proceedings consistent with this opinion. 1

II

**BACKGROUND**

Bruce is serving a life sentence in the California penal system. He alleges, as described below, that he has been investigated for prison gang affiliation on three occasions.

When Bruce was transferred to North Kern State Prison in November, 1995, an investigation of his alleged{2003 U.S. App. LEXIS 3} association with the Black Guerilla Family (BGF) was undertaken by the Institutional Gang Investigator (IGI). The IGI found the following evidence insufficient to validate Bruce as a BGF member: a report from the Los Angeles Sheriff's Department dated August

A09CASES                                               4

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

the evidence; rather, "the relevant question is whether there is any evidence in the record that could support the conclusion." 472 U.S. at 455-56. Clearly, there was some evidence in the record to support the conclusion that Bruce had ties to the BGF. This included the Los Angeles Sheriff's Department report that Bruce was an associate of the BGF, as well **{351 F.3d 1288}** as the Venice Shoreline Crips, a probation report noting that Bruce's codefendant on his underlying conviction was also validated as a member of the BGF, and the statement of the confidential prison informant.

The district court correctly noted that under the "some evidence" standard, any of these three pieces of evidence would have sufficed to support the validation because each has sufficient indicia of reliability. *See Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990).**{2003 U.S. App. LEXIS 7}** Given that some evidence supported the validation decision, the district court properly entered summary judgment in favor of defendant prison officials on Bruce's due process claim.

**C. Equal Protection Claim**

Bruce's equal protection claim was also properly dismissed on summary judgment. Bruce argues that the state denied him the same procedures it affords other suspected gang affiliates because of his jailhouse lawyering activity. Although the Equal Protection Clause ensures similarly situated persons are treated alike, it does not ensure absolute equality. *U.S. v. Devlin*, 13 F.3d 1361, 1363 (9th Cir. 1994) (citing *Ross v. Moffitt*, 417 U.S. 600, 609, 612, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974)). Because, as discussed above, Bruce was afforded the process he was due, the same process all gang affiliates are due, any purported difference in treatment does not rise to the level of an equal protection violation.

**D. Retaliation Claim**

Bruce alleges that prison officials violated his First Amendment right to file prison grievances when they validated him as a BGF member in retaliation for his filing of several grievances. As we recognized in *Hines v.* **{2003 U.S. App. LEXIS 8}** *Gomez,* a chilling effect on a prisoner's First Amendment right to file prison grievances is sufficient to raise a retaliation claim. 108 F.3d 265, 269 (9th Cir. 1997) (citing *Sandin v. Conner*, 515 U.S. 472, 487, fn 11, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995)).

**1. Merits**

"A prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett*, 31 F.3d at 816 (citing *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)).

*Retaliatory Motive*

Bruce put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to the prison officials' intent in initiating his validation investigation.

First, Bruce offered the suspect timing of the validation -- coming soon after his success in the prison conditions grievances. In *Pratt v. Rowland*, we recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent. **{2003 U.S. App. LEXIS 9}** " 65 F.3d 802, 808 (9th Cir. 1995).

Second, Bruce raises the fact that the same evidence cited by the IGI to validate him was previously determined to be insufficient to conclude he was a BGF member. This evidence, while not conclusive of retaliatory motive, tends to show that the validation was not motivated by any recent

A09CASES          **6**

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

gang activity on Bruce's part.

Additionally, Bruce clearly asserted facts in his Declaration in Opposition to the Motion for Summary Judgment that, if true, show that IGI Washington's accusation of gang activity was improperly motivated. {351 F.3d 1289} Specifically Bruce alleges the following:

> I asked Washington if he had contacted the IGI's at North Kern and Pelican Bay. He responded, 'No. And I don't have to.' Washington then stated that I had 'pissed off higher-ups' with my 'complaints and protests' and the last incident 'where you acted as spokesperson for other prisoners' complaints was the last straw.' Washington then stated that Lt. Coziahr and himself were ordered by these 'higher-ups to validate you.' . . . Washington stated also to me, 'The higher-ups want you validated to make an example out of you to discourage similar complaints and protests{2003 U.S. App. LEXIS 10} . . . the bosses don't care for organized complaining. . . . Your family filing a complaint to the Warden wasn't a good idea either.' This is 'exactly the sort of thing that pisses off the higher-ups.' Washington then stated 'the Warden called me this morning asking about your validation.' . . . I asked Washington what evidence was being used against me, he refused to say except to state, 'it was already in your c-file when it was sent to our office.'

These statements combined with the suspect timing of the investigation and the fact that stale evidence was used, certainly raise a triable issue of fact regarding whether the motive behind the validation was retaliatory.

*Legitimate Penological Goals*

In *Pratt*, the court made clear that the prisoner plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." 65 F.3d at 806.

The state argues that because there was "some evidence" that Bruce was a BGF affiliate, and because the gang validation procedures serve the valid penological purpose of security and safety, summary judgment was proper. In *Hines*, however, we held that the "some{2003 U.S. App. LEXIS 11} evidence" standard of Hill did not apply to retaliation claims. 108 F.3d at 269. The "some evidence" standard applies only to due process claims attacking the result of a disciplinary board's proceeding, not the correctional officer's retaliatory accusation. *Id.*

It is clear, and Bruce concedes, that prisons have a legitimate penological interest in stopping prison gang activity. *See Bell v. Wolfish*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Madrid v. Gomez*, 889 F. Supp. 1146, 1240-1241 (N.D. Cal. 1995). But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have *arguably* ended up where he belonged. *See Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) ("Plaintiff has alleged that [prison official] Stocker's actions were retaliatory and were arbitrary and capricious. He has thereby sufficiently alleged that the retaliatory acts were not a reasonable exercise of prison authority and that they did not serve any legitimate correctional{2003 U.S. App. LEXIS 12} goal.").

This comports with other circuits holding that prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right. *See Cornell v. Woods*, 69 F.3d 1383, 1388-89 (8th Cir. 1995); *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995); *Smith v. Maschner*, 899 F.2d 940, 948-49 (10 Cir. 1990).

Because Bruce raised a jury issue that the stated penological goals were not legitimate, {351 F.3d 1290} summary judgment was not appropriate on the retaliation claim.

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

*Damages*

Bruce prays for declaratory, injunctive, and monetary relief. Specifically, Bruce asks this court to declare that the evidence relied upon in his validation is unreliable and does not establish gang membership, and that as a matter of due process the prison officials should be enjoined from relying on this information in the future.

In fashioning a remedy, federal courts must remember that the duty to protect inmates' constitutional rights does not confer the power to **{2003 U.S. App. LEXIS 13}** manage prisons or the capacity to second-guess prison administrators, for which we are ill-equipped. *Touissant v. McCarthy (Touissant IV)*, 801 F.2d 1080, 1086 (9th Cir. 1986). "The relief ordered by federal courts must be consistent with the policy of *minimum intrusion into the affairs of state prison administration*." *Id.* (emphasis added).

On these facts, monetary damages, nominal or otherwise, may be appropriate if Bruce should prevail at trial. But he is not entitled to declaratory or injunctive relief on the record before us because it is not the purview of the federal courts to interfere directly with prison administration in the manner he asks. The prison cannot be foreclosed from using the same evidence in the future in connection with his continuing imprisonment. Nor will we provide any declaration regarding Bruce's affiliation or non-affiliation with the BGF.

**2. Qualified Immunity**

In two footnotes, the district court stated that defendants were entitled to qualified immunity. We hold that as to the retaliation claim, defendants are not entitled to qualified immunity.

"Government officials enjoy qualified immunity from civil damages unless**{2003 U.S. App. LEXIS 14}** their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)). As this court pointed out in *Pratt*, "the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." 65 F.3d at 806 (citing *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995).

**IV**

**CONCLUSION**

The district court improperly dismissed Bruce's retaliation claim on summary judgment. Viewed in the light most favorable to him, there were genuine issues of material fact relating to the prison officials' intent in investigating and ultimately validating him as a member of the Black Guerrilla Family prison gang. Prison officials cannot use a proper and neutral procedure in retaliation for a prisoner's exercise of his constitutional rights. While First Amendment rights are curtailed in prison, they are not lost. As Bruce's success in his grievances shows, there must be avenues for prisoners**{2003 U.S. App. LEXIS 15}** to redress the wrongs or inadequacies of their state jailors.

The parties shall bear their own costs.

AFFIRMED in part, REVERSED and REMANDED in part.

**Footnotes**

*

A09CASES                                                    8

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

1     The district court also stayed discovery, an order we do not address directly. We note only that remand for further proceedings necessitates that the stay be lifted.

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

09304091

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Attachment B

# Senators Spank BOP Director on Last Day Before Replacement by Former Oregon DOC Director

*by Jacob Barrett*



On August 2, 2022, the federal Department of Justice introduced its pick to helm the nation's Bureau of Prison (BOP): Collette Peters, the director of Oregon's Department of Corrections (DOC) since 2012. She fills a slot vacated by retiring BOP Director Michael Carvajal, a career agency employee—he began work as a guard in 1992—tapped by former Attorney General William P. Barr in February 2020.

Carvajal's tenure, plagued by criminal activity and sexual abuse by guards, prisoner deaths and dozens of escapes, was capped with a contentious hearing at the U.S. Senate Permanent Investigation Subcommittee on August 1, 2022, the day before Peters took over. There Carvajal's attempts to deflect blame to subordinates earned a bi-partisan dressing-down from Chairman Sen. John Ossoff (R-Ga.) and Ranking Sen. Ron Johnson (R-Wisc.).

"It's almost willful ignorance, and that's what I find disturbing," Johnson fumed, caricaturing Carvajal's response to BOP's crises as: "'Don't want to know what's happening below me. Don't want to hear about rapes. Don't want to hear about suicides.'"

"It's a disgrace," Ossoff agreed. "And for the answer to be 'other people deal with that. I got the report. I don't remember.' It's completely unacceptable."

Peters, who has been credited with minor reforms at DOC, is no stranger to controversy herself. In 2020, she was forced to publicly apologize for the death of prisoner Michael Barton from a neglected case of the flu that staff then attempted to cover up, leading to a record $2.75 million settlement for his family. [See: *PLN*, Mar. 2021, p.48.]

Like Carvajal, Peters was also criticized for her response to the COVID-19 pandemic, which resulted in over 7,500 infections among DOC's 14,000 prisoners and 4,700 staffers, more than 50 of whom have died. Nearly 50,000 of BOP's 140,000 prisoners were infected on Carvajal's watch, along with almost 14,000 of its 36,000 employees. Over 300 federal prisoners and seven staff members died.

Carvajal was also criticized for failing to implement the First Step Act, a bipartisan criminal justice measure designed to improve prison programs and reduce sentencing disparities.

Under Peters, DOC tried to adopt "the Oregon Way," with a "smart on rehabilitation" culture modeled on progressive countries like Norway. But after planting a Japanese garden at the state penitentiary and swapping the term "inmate" for "adult in custody," the state still lacks important offender programming, including any treatment for convicted sex offenders, who are more than 30% of its prisoners [See: *PLN*, May 2018, p.40.]

After Carvajal announced his retirement in January 2022, a bill was introduced in Congress to require Senate confirmation for the new BOP Director. It stalled, however, leaving Peters to take over the job without congressional scrutiny. ◾

Sources: *Associated Press, Eugene Register-Guard, Oregon Statesman Journal, Washington Post*

# New York Lifts Blanket Internet Ban on Sex Offenders

*by Jayson Hawkins*

A settlement was finalized on January 19, 2022, in a lawsuit challenging a New York law barring those on the state sex offender registry from accessing the internet. The settlement allows some registered sex offenders now to access and use the internet, unless they previously used it in committing their offense.

Attorneys from the New York Civil Liberties Union and Rutgers Constitutional Rights Clinic filed the suit in federal court for the Eastern District of New York in March 2020 on behalf of plaintiffs Vernon Jones, Vladimir Krull, Thomas Mitchell, Compton Mohabir, and Corydon Umber. Proceeding under 42 U.S.C. § 1983, they accused state Board of Parole Chairperson Tina M. Stanford and then-Director of the state Department of Corrections and Community Supervision (DOCCS), Anthony Annucci, of violating their First Amendment free speech rights with an internet ban that left them "banished en masse from an essential resource that helps them reintegrate into society."

The law in question, the Electronic Security and Targeting of Online Predators (e-STOP) Act of 2008, places "commercial social networking websites" off-limits to any registered sex offender (a) whose victim was a minor, or (b) who is "designated a level three sex offender" or (c) who used the internet "to facilitate the commission of the crime."

But the law went on to define the websites at issue as any which allow creation of a user profile by an adult to engage in direct communication with a minor. As DOCCS quickly figured out, that wasn't limited to social media sites like Facebook and Myspace but also included sites used for job searches, apartment hunting, staying in touch with family—even reading the news. Its Directive 9201, which implemented the law, was thus applied broadly to all registered level three sex offenders in the state whose victim was a minor, regardless of whether the internet was used in committing their offense.

So after hearings on the issue, the Court decided Plaintiffs were likely to prevail on the merits of their claim under the test laid out by the U.S. Supreme Court in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), quoting that to note the ban appeared to "burden substantially more speech than is necessary to further the … government's legitimate interests" in protecting juveniles from sexual predation.

Because the ban was extended to all websites with a social media component, it was not "narrowly tailored," the Court continued, nor did it provide "a mechanism to conduct an individualized assessment

Attachment C

completes the inquiry. Plaintiff cannot side-step this inquiry with an assertion of a retaliatory motive.

But even accepting as true Plaintiff's argument that his gang validation was initiated for retaliatory reasons, he still has not shown he was denied an appropriate level of process. By his own admission, Plaintiff engaged in the administrative remedy process and received notice of his proposed transfer to ADX Florence, and a hearing. ECF No. 1 at 10, 15-16. *See, e.g., Freeman v. Rideout*, 808 F.2d 949, 949 (2d Cir. 1986) (filing of allegedly false charges against appellee prison inmate did not constitute a per se violation of Due Process, and in any event, the prison disciplinary hearing provided appellee prison inmate with due process). Even assuming the photograph of the Aryan Brotherhood paraphernalia from Plaintiff's cell or the alleged inaccurate mental health evaluation were improperly placed in his prison record, Plaintiff was afforded an opportunity to be heard.

The function of the Due Process Clause in this context, if applied, "would be to protect prisoners against erroneous classifications that might cause them a grievous loss," and "this risk appears largely minimized by the procedures adopted by the Bureau, which include notices of tentative and final designations to each potential [gang member], a generalized statement of the reasons and basis for the designation, permission to submit oral or written objections supported by documentary evidence, and the right of administrative appeal." *Pugliese v. Nelson*, 617 F.2d 916, 925-26 (2d Cir. 1980) (internal citations omitted). This is precisely the process Plaintiff received in this case. He points to no constitutional or statutory authority for any additional process owing to him.

## VI.   Plaintiff Has Failed to Establish A Violation of His Eighth Amendment Rights

Having conceded that he has no Eighth Amendment right to placement in a particular facility, Plaintiff asserts again the alleged retaliatory motive underlying his gang classification,

Attachment D

*? Program Statement 5100.08 (2006) http://www.bop.gov/progstat/5100.08.pdf*
*— last visited March 19, 2017*

**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

*See BOP Program Statement No. 5180.2 (June 1, 1979c)*
*Formerly Policy Statement 7900.53A (April 7, 1976) ??*

**OPI:**    CPD

**NUMBER:**    5180.05

**DATE:**    12/31/2007

**SUBJECT:**    Central Inmate Monitoring System

This is an electronic re-issuance for technical reasons only. There are no substance or word changes to the document.

1.    [<u>PURPOSE AND SCOPE</u> §524.70.    The Bureau of Prisons monitors and controls the transfer, temporary release (e.g., on writ), and community activities of certain inmates who present special needs for management.    Such inmates, known as central inmate monitoring (CIM) cases, require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities.    This monitoring is not to preclude a CIM case from such activities, when the inmate is otherwise eligible, but rather is to provide protection to all concerned and to contribute to the safe and orderly operation of federal institutions.]

Detailed instructions and guidelines for implementation of the Central Inmate Monitoring System are contained in the CIM Operations Manual.    The CIM manual is designated as "Limited Official Use Only" and shall be maintained in accordance with the

progstat                                        1

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Programs Division).]

The vast majority of witness security (WITSEC) cases are those authorized by the Attorney General. Both types of WITSECs are treated similarly while in Bureau custody.

[b. **Threats to Government Officials.** Inmates who have made threats to government officials or who have been identified, in writing, by the United States Secret Service as requiring special surveillance.

c. **Broad Publicity.** Inmates who have received widespread publicity as a result of their criminal activity or notoriety as public figures.

d. <mark>**Disruptive Group.**</mark> Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.

e. **State Prisoners.** Inmates, other than Witness Security cases, who have been accepted into the Bureau of Prisons for service of their state sentences. This assignment includes cooperating state witnesses and regular state boarders.

f. **Separation.** Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future. Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual (in open court, to a grand jury, etc.), and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution. This assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others. This assignment

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

designations, transfers, court appearances, and other movements.

(3)  <u>Special Supervision.</u>  Placement in this assignment may be made only upon the authorization of a Regional Director or the Assistant Director, Correctional Programs Division.

(4)  <u>Recommitted Offenders.</u>  An inmate who is recommitted to federal custody, who at the time of release was classified as a CIM case, retains this classification pending a review of the CIM status in accordance with paragraph (c) of this section.

b.  <u>Notification.</u>  The case manager shall ensure that the affected inmate is notified in writing as promptly as possible of the classification and the basis for it.  Witness Security cases will be notified through a commitment interview.  The notice of the basis may be limited in the interest of security or safety. For example, in separation cases under §524.72, notice will not include the names of those from whom the inmate must be

separated.  The inmate shall sign for and receive a copy of the notification form.  If the inmate refuses to sign the notification form, staff witnessing the refusal shall indicate this fact on the notification form and then sign the form. Notification is not required for pretrial inmates.  Any subsequent modification of a CIM assignment or removal from the CIM system requires separate notification to the inmate.]

28 CFR 524.72 refers to Section 7 of this Program Statement. For purposes of this Program Statement, "prompt" has been

defined as within 30 days of classification.

[c.  <u>Initial Review.</u>  A classification may be made at any level to achieve the immediate effect of requiring prior clearance for an inmate's transfer, temporary release, or participation in community activities.  Except for Central Office or Regional Office classification of an individual as a state prisoner in

sole service of the state sentence or for classification of pretrial inmates made by designated staff at the institution, a review by designated staff (ordinarily within 60 days of notification to the inmate) is required to determine whether a sound basis exists for the classification.  Staff making the initial classification shall forward to the reviewing authority

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

==complete information regarding the inmate's classification.== An inmate not notified of a change in the classification by the reviewing authority within 60 days from the date of the initial notification may consider the CIM classification final. Reviewing authorities for CIM classification are:

(1)   <u>Central Office Inmate Monitoring Section</u> - reviews classification decisions for all future separation assignments (including recommitments) for Witness Security cases and for any combination of assignments involving Witness Security cases.

(2)   <u>Regional Office</u> - reviews CIM classification decisions for Disruptive Group, Broad Publicity, Threat to Government Officials, Special Supervision, State Prisoners not in sole service of state sentence and initial multiple assignments except Witness Security cases.

(3)   <u>Warden, or Designee</u> - reviews CIM classification decisions for all separation assignments.]

Warden refers to Chief Executive Officer and includes

Community Corrections Managers.

[d.   <u>Removal</u>

(1)   Because participation in the Department of Justice Witness Security Program is voluntary, such participants may request removal from this assignment at any time.  Such request shall be forwarded to the Central Office Inmate Monitoring Section.  Actual removal of the CIM assignment will not occur until after approval from the Department of Justice is received.

(2)   The reviewing authority is responsible for determining if removal or modification of any CIM classification other than a Department of Justice Witness Security case is appropriate.  The inmate retains the CIM classification pending a decision by the reviewing authority.

(3)   When an inmate is removed for any reason from a CIM classification (for example, because the reviewing authority either disapproves the CIM classification or approves removal of a CIM classification based on new information), the appropriate staff member shall ensure that the relevant portions of the inmate central file are either removed or, when part of a larger

progstat                                  8

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.